**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

Bayer HealthCare LLC,

    *Plaintiff,*

v.

Aeropres Corporation,

    *Defendant.*

No. 23 CV 4391

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Plaintiff Bayer HealthCare LLC ("Bayer") filed this action against Defendant Aeropres Corporation ("Aeropres"), seeking damages for breach of contract, breach of express and implied warranties, negligence, and strict liability arising from benzene contamination of a component used in Bayer's antifungal spray products. [Dkt. 1.] Before the Court is Aeropres's motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), or alternatively, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). [Dkt. 13.] For the reasons stated below, the motion is granted in part and denied in part.

## I.    Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) challenges the Court's subject-matter jurisdiction, while a motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. In both cases, the Court takes well-pleaded factual allegations as true and draws reasonable inferences in favor of the plaintiff. *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023); *Reardon v. Danley*, 74 F.4th 825, 826−27 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6),

1

plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up).

## II.   Background[1]

Bayer, a Delaware limited liability company,[2] is a pharmaceutical company that develops, manufactures, and sells antifungal spray products Lotrimin and Tinactin. [*See* Dkt. 1, ¶¶1−2, 25−26, 31, 34, 40−41.] Aeropres is a corporation incorporated in and with its principal place of business in Louisiana; it manufactured and supplied Bayer with Propellant A-31, an isobutane product used in Lotrimin and Tinactin. [*Id.*, ¶¶1−2, 21, 26.]

In July 2017, Bayer and Aeropres entered into a Quality Assurance Agreement ("QAA"), outlining Aeropres's responsibilities regarding the quality assurance and regulatory aspects of manufacturing and supplying Propellant A-31 for Bayer's Lotrimin and Tinactin products. [*See id.*, ¶¶25−30.] As alleged in the Complaint, the QAA calls for Aeropres to: manufacture, process, package, test and distribute products "on its own responsibility, in accordance with agreed chemical formulae, manufacturing processes, instructions, applicable law, and Good Manufacturing

---

[1]     The following factual allegations are taken from Bayer's Complaint and are accepted as true for the purposes of the motion. *Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023). In setting forth the facts at the pleading stage, the Court does not vouch for their accuracy. *See Goldberg v. United States*, 881 F.3d 529, 531 (7th Cir. 2018).

[2]     For federal jurisdiction, Bayer has nine members and is a citizen of Delaware, New Jersey, Pennsylvania, and the Netherlands. [Dkt. 1, ¶¶11−20.]

Practice ('GMP')"; ensure that the components of Propellant A-31 were on the "Generally Recognized as Safe List"; and "conduct manufacturing and quality control operations of [Propellant A-31] according to formulas, instructions and valid manufacturing procedure set up by [Aeropres] and approved by [Bayer], as well as applicable United States Food and Drug Administration ('FDA') requirements and GMP." [*Id.*, ¶¶27−29; Dkt. 15-1 at 1−2.][3] The QAA also specified that in case of a product recall, Aeropres would bear the costs of product technical and quality complaints, recalls, and replacement of affected Propellant A-31, provided the cause of the complaint or recall occurred within Aeropres's scope of responsibility, with these costs charged to Aeropres by Bayer. [Dkts. 1, ¶30; 15-1 at 4.]

Approximately two years after the QAA was executed in May 2019, Bayer's parent company assigned Bayer's rights under the QAA to Beiersdorf AG ("Beiersdorf"). [Dkt. 1, ¶¶31−32, 34.] After receiving the Notice of Assignment, Aeropres consented to assignment of the QAA to Beiersdorf in August 2019, and shortly thereafter, the transaction between Bayer and Beiersdorf was finalized. [*Id.*, ¶¶32−34; *see* Dkt. 15-2.] From that point forward, Aeropres supplied Propellant A-31 directly to Beiersdorf, which in turn manufactured, packaged, and supplied finished Lotrimin and Tinactin products to Bayer. [Dkt. 1, ¶¶34, 63.]

---

[3]      Although Bayer did not attach the QAA, the Notice of Assignment of the QAA, or Aeropres's benzene contamination letter to the Complaint, [*see* Dkt. 1], Aeropres attached these documents to its motion to dismiss. [Dkts. 15-1; 15-2; 15-5.] A court may consider a document "referred to in the complaint provided it was a concededly authentic document central to the plaintiff's claim (the usual example is a contract, in a suit for breach of contract)" without converting a motion to dismiss to a motion for summary judgment, *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002), so the Court considers these materials here.

On August 11, 2021, Aeropres sent a letter to Beiersdorf notifying it of potential benzene contamination in the Propellant A-31 it supplied. [*Id.*, ¶35; Dkt. 15-5.] Classified as a human carcinogen at certain levels, the FDA has advised manufacturers to avoid using benzene in drug manufacturing processes because benzene cannot be removed from Propellant A-31 once contamination has occurred. [Dkt.s 1, ¶¶37−38; 15-3.][4] Aeropres's letter to Beiersdorf stated that "the nature of the [ ] materials precludes our ability to assure that there are no residual [benzene] solvents in the finished product," and that it "regret[ed] this development as it is not in keeping with Aeropres'[s] standards of product manufacture." [Dkts. 1, ¶¶35−36; 15-5.] Two days later, Beiersdorf informed Bayer about the benzene contamination issues. [Dkt. 1, ¶39.]

Upon discovering the benzene contamination, both Beiersdorf and Bayer tested samples of unexpired Lotrimin and Tinactin products; Beiersdorf's September 2021 test results confirmed benzene levels above the FDA's threshold in some products. [*Id.*, ¶¶40−41.] Bayer's testing of certain samples manufactured beginning in September 2018—the date of manufacture of the oldest unexpired lots—also showed benzene contamination. [*Id.*, ¶41.] Bayer alleges that as a direct consequence

---

[4]     The CDC and FDA webpage hyperlinks in Bayer's Complaint at footnotes 1, 2, and 3—which are also attached to Aeropres's motion to dismiss as Exhibits 15-3, 15-4 and 15-6, respectively—are incorporated by reference. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012) ("[T]he incorporation-by-reference doctrine provides that if a plaintiff mentions a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment.").

of Aeropres's supply of benzene-contaminated Propellant A-31, it announced a recall on October 1, 2021 of certain Lotrimin and Tinactin products. [*Id.*, ¶42; Dkt. 15-6.]

In February 2023, Bayer informed Aeropres that the benzene contamination and subsequent product recall had led to significant financial losses, including millions for refunds to stores and consumers, write-offs for damaged unsaleable products, ongoing litigation defense costs, and other damages. [Dkt. 1, ¶¶45, 51−54, 60.] According to Bayer, "[b]y the time the contaminated Propellant A-31 reached Bayer's possession, [it] had been combined with the Lotrimin and Tinactin products" with no ability to extract it. [*Id.*, ¶53.] Bayer alleges that Aeropres has refused to bear the recall costs or compensate Bayer for its damages. [*Id.*, ¶50.]

In July 2023, Bayer filed this lawsuit, seeking to require Aeropres to pay for the damages caused by its supply of benzene-contaminated Propellant A-31. Bayer brings claims for breach of contract as a direct claim (Count I); breach of contract as a third-party beneficiary (Count II); breach of express warranties (Count III); breach of implied warranty of merchantability (Count IV); breach of implied warranty of fitness for a particular purpose (Count V); negligence (Count VI); and strict liability (Count VII). [*Id.* at 10−18.][5] Aeropres has moved to dismiss Bayer's Complaint in its entirety under Rule 12(b)(1), arguing that Plaintiffs have failed to demonstrate Article III standing, or in the alternative under Rule 12(b)(6), asserting that Bayer's claims fail on the merits. [Dkt. 13.]

---

[5]      Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

### III.    Analysis

#### A.    Standing Under Rule 12(b)(1)

Because Article III standing is a necessary component of federal jurisdiction, the Court addresses it first. *See Kithongo v. Garland*, 33 F.4th 451, 454 (7th Cir. 2022) ("The 'first and fundamental question' our court must answer 'is that of jurisdiction.'") (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998)). The doctrine of "standing is an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 112 S. Ct. 2130, 2136 (1992). It requires that the plaintiff demonstrate that he has a "personal stake in the case" sufficient to justify the exercise of federal judicial power. *TransUnion v. Ramirez*, 594 U.S. 413, 423 (2021). To establish Article III standing, the party invoking federal jurisdiction must show that: "(1) the plaintiff has suffered an injury-in-fact, (2) the injury was caused by the defendant, and (3) the injury is redressable by judicial relief." *Ewing v. MED-1-Sols., LLC*, 24 F.4th 1146, 1150−51 (7th Cir. 2022) (citing *Lujan*, 504 U.S. at 560–61). As the party invoking federal jurisdiction, Bayer bears the burden of establishing its standing to sue. *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citations omitted).

#### 1.    Injury-in-fact

Aeropres's standing argument first focuses on Bayer's failure to plead an injury-in-fact, [Dkt. 15 at 13], which demands that injuries are concrete, and actual or imminent. *Ewing*, 24 F.4th at 1151. "To be concrete, an injury must be "real, and not abstract." *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 734 (7th Cir. 2023) (citation omitted). "Traditional tangible harms, such as [ ] monetary harm, easily meet the

concreteness requirement." *Ewing*, 24 F.4th at 1151 (citation omitted); *Big Shoulders Cap. LLC v. San Luis & Rio Grande R.R., Inc.*, 13 F.4th 560, 568 (7th Cir. 2021) (monetary harms "readily qualify as concrete injuries") (cleaned up). Put differently, "financial injuries are prototypical of injuries for the purposes of Article III standing." *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 639 (7th Cir. 2017) (citation omitted).

Bayer asserts that the losses, damages, and expenses it incurred as a result of Aeropres's supply of contaminated Propellant A-31 in its products, including millions in recall costs, write-offs for damaged products, and consumer lawsuits alleging benzene-related injuries from Lotrimin and Tinactin, are concrete and particularized. [Dkt. 32 at 12 (citing Dkt. 1, ¶¶51−54, 60).] The Court agrees. Financial losses "'readily qualify as concrete injuries.'" *Big Shoulders Cap. LLC*, 13 F.4th at 568 (citation omitted).

Aeropres does not dispute that these financial losses are cognizable injuries. [*See* Dkt. 42 at 5 (acknowledging Bayer incurred expenses in recalling certain lots of Lotrimin and Tinactin and in defending against lawsuits that followed the recall).] Instead, it argues that Bayer's injuries are "self-inflicted and based on fears of hypothetical future harm" because Bayer does not allege that "its pre-August 2019 Lotrimin or Tinactin contained levels of benzene that exceeded the FDA's acceptable limits"; Bayer's recall was a voluntary, precautionary measure; and because Bayer stated in its recall announcement that it "was unaware of any reports of 'adverse events' related to the recall." [Dkt. 15 at 13.]

These arguments are not questions of standing—they are merits arguments repackaged as standing arguments. Issues concerning the circumstances of the recall—*i.e.*, whether it was voluntary or mandated by a government agency, or even its "inconsistency" with FDA guidance—are irrelevant to standing. *See Aurora Loan Servs., Inc. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006) ("The point is not that to establish standing a plaintiff must establish that a right has been infringed; that would conflate the issue of standing with the merits of the suit. It is that he must have a colorable *claim* to such a right.") (emphasis in original). Because Bayer alleges it has suffered and continues to suffer concrete, particularized financial losses and monetary harm due to contaminated Propellant A-31, [Dkt. 1, ¶¶45, 51–54, 60], the injury-in-fact requirement is satisfied.

It is true, as Aeropres argues, that a plaintiff cannot "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402, 409, 416 (2013) (rejecting plaintiffs' argument that they suffered an injury-in-fact where they voluntarily engaged in costly and burdensome measures that they claimed were necessary to protect their communications from a government surveillance program because they could not show that they had been, or were likely to be, subjected to surveillance). But Bayer's injuries are neither hypothetical nor self-inflicted. The type of self-inflicted harm discussed in *Clapper* is not implicated here. Bayer did not conduct a voluntary recall and incur damages to prevent speculative future harm. Instead, the Complaint alleges that after receiving positive

test results from Lotrimin and Tinactin samples manufactured as early as September 2018, it announced a recall, and as a result, incurred millions in costs. [Dkt. 1, ¶¶39−42, 51−54.] This suffices to allege a concrete and particularized economic injury for the purposes of Article III standing.

Nor does the Court agree with Aeropres's assertion that Bayer was required to show harm *to consumers* to confer standing. The Complaint alleges injury to Bayer, not consumers or users of Lotrimin and Tinactin, based on the alleged refusal to refund Bayer for the costs of the recall. *See Levey v. Concesionaria Vuela Compania de Aviacion, S.A.P.I. de C.V.*, 529 F. Supp. 3d 856, 862–63 (N.D. Ill. 2021) (holding that the airline customer's allegations that she suffered an injury caused by the airline's refusal to refund her ticket for a cancelled flight was a concrete and particularized injury-in-fact, even if the customer did not definitively establish that she was contractually entitled to a refund).

This is all to say that the Court finds unpersuasive Aeropres's arguments that Bayer's injuries are hypothetical or "self-inflicted." Bayer has satisfied the requirement that its injury be concrete, that is, "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

### 2. Traceability

Aeropres also argues that Bayer has failed to allege that its injury is "fairly traceable" to Aeropres's conduct. [Dkt. 42 at 5–6.] According to Aeropres, Bayer has not alleged that any "pre-QAA assignment" product contained levels of benzene that exceeded the FDA's acceptable limits, [Dkt. 15 at 6], nor that it tested "pre-QAA

assignment" product supplied by Aeropres which "revealed levels of benzene exceeding the FDA's threshold." [Dkt. 42 at 6.]

Once again, this argument blurs the line between standing and entitlement to relief. *Arreola v. Godinez*, 546 F.3d 788, 794–95 (7th Cir. 2008) ("Although the two concepts unfortunately are blurred at times, standing and entitlement to relief are not the same thing. Standing is a prerequisite to *filing suit*, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is *entitled to relief*") (emphasis in original). The Complaint alleges Bayer commissioned testing of products it received before the August 2019 reassignment, "which revealed that Lotrimin and Tinactin samples manufactured beginning in September 2018, the date of manufacture of the oldest unexpired lots, were contaminated with benzene." [Dkt. 1, ¶ 41.] It also alleges "Aeropres provided Bayer with Propellant A-31 containing benzene amounts exceeding acceptable limits established by [the] FDA," prompting the recall. [*Id.*, ¶ 59.] And while not strictly necessary, the Complaint incorporates FDA guidance alerting manufacturers to certain risks associated with use of benzene, including that drug manufactures should avoid using benzene in the manufacturing processes. [*Id.*, ¶ 37.] Finally, as already discussed, Bayer has alleged that it suffered financial losses as a consequence of Aeropres's refusal to refund it for recall-associated costs, [*Id.*, ¶¶30, 44, 50], which is all that is required at the pleading stage to satisfy the fairly traceable requirement for standing. *See Johnson v. U.S. Office of Pers. Mgmt.*, 783 F.3d 655, 660 (7th Cir. 2015) (holding that an injury-in-fact is "fairly traceable" if it results from the

defendant's alleged conduct). The Court therefore finds that Bayer has satisfied the requirements for standing, and the motion to dismiss under Rule 12(b)(1) is denied.[6]

## B.    Failure to State a Claim under Rule 12(b)(6)

The Court next addresses whether Bayer has adequately pled claims for breach of contract under the direct theory of liability and as a third-party beneficiary, breach of express and implied warranties, negligence, and strict liability, each of which Aeropres has moved to dismiss under Rule 12(b)(6).

Because the Court sits in diversity, it "applies state 'substantive' law and federal 'procedural' law." *Mathis v. Metro. Life Ins. Co.*, 12 F.4th 658, 661 (7th Cir. 2021) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)); *see also* 28 U.S.C. § 1652. The parties agree that Illinois law governs Bayer's claims [*see* Dkts. 15 at 14–23; 32 at 20–24], and the Court sees no reason to conclude otherwise. Therefore, the Court applies the law of the forum state. *See Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.*, 611 F.3d 339, 345 (7th Cir. 2010).

### 1.    Breach of Contract – Direct Claim (Count I)

Aeropres moves to dismiss Bayer's breach of contract claim under the direct theory of liability (Count I). Under Illinois law, a breach of contract claim requires

---

[6]    Aeropres's opening brief in support of dismissal does not analyze redressability. Nor does it meaningfully do so in its reply, other than to say that "Bayer's inability to plausibly allege traceability means that its injuries are not redressable in a case against Aeropres." [Dkt. 42 at 6.] Because the Court concludes Bayer has shown traceability, it easily concludes that Bayer's financial losses can be redressed by monetary damages. *G & S Holdings LLC v. Continental Cas. Co.*, 697 F.3d 534, 540 (7th Cir.2012) (complaint alleging economic harm caused by defendant's conduct that can be redressed by damages is sufficient to satisfy "minimal standard" for pleading standing). Even if the Court had not reached this conclusion, arguments raised for the first time in a reply brief are waived. *United States v. Williams*, 85 F.4th 844, 849 (7th Cir. 2023) ("Just as undeveloped arguments are waived, so are arguments raised for the first time in reply briefs.").

the plaintiff to plausibly allege: (1) the existence of an offer and acceptance, (2) consideration, (3) definite and certain terms, (4) performance by the plaintiff of all required conditions, (5) breach, and (6) damages. *See MC Baldwin Fin. Co. v. DiMaggio, Rosario & Veraja, LLC*, 845 N.E.2d 22, 30 (Ill. App. Ct. 2006). In construing contracts under Illinois law, courts "aim to ascertain the parties' intent by first consulting the plain and ordinary meaning of the contract language." *Page v. Alliant Credit Union*, 52 F.4th 340, 346 (7th Cir. 2022) (cleaned up). "If the language of an alleged contract is ambiguous regarding the parties' intent, the interpretation of the language is a question of fact which a court cannot properly determine on a motion to dismiss." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 526 (7th Cir. 2022) (quoting *Quake Constr., Inc. v. Am. Airlines*, Inc., 565 N.E.2d 990, 994 (Ill. 1990)).

Aeropres first argues that Bayer's breach of contract claim is precluded by the Notice of Assignment. [Dkt. 15 at 15.] The Notice of Assignment states in relevant part that as of the August 2019 Closing, "Bayer shall have no further rights under the Agreement and will be released from and not liable in any way for the performance or non-performance of Bayer under the Agreement with respect to matters arising after the Closing." [Dkt. 15-2 at 1.] Nothing in this provision releases Aeropres from any claims arising from the QAA, nor does it address Bayer's right to seek damages for a recall arising from contaminated product supplied prior to August 2019. This interpretation is consistent with the "Final Provisions" section of the QAA itself, which provides that "[t]he termination of this Agreement shall not affect the

12

validity of any provision which is by implication intended to continue in force after such termination (e.g., complaints/recalls)," and with the QAA's "Complaints and Recalls" provision, which states that Aeropres is responsible for bearing the costs of "recalls, and replacement of affected Product." [Dkt. 15-1 at 4.] The Notice of Assignment did not release Bayer's right to pursue a breach of contract claim arising from the QAA.[7]

Next, Aeropres contends that the Complaint does not contain sufficient facts alleging that Aeropres "received anything of value from Bayer." [Dkt. 15 at 16.] According to Aeropres, the QAA "makes clear it is contingent on a 'Supply Agreement' or purchase orders for Propellant A-31," and because the Complaint does not allege the existence of any purchase order or supply agreement, the contract claim fails for lack of consideration. [*Id.*] Consideration is a bargained-for exchange of promises or performances. *Bishop v. We Care Hair Development Corp.*, 738 N.E.2d 610, 622 (Ill. App. Ct. 2000); *Doyle v. Holy Cross Hosp.*, 708 N.E.2d 1140, 1145 (Ill. 1999). It may consist of a promise, an act, or a forbearance. *Bishop*, 738 N.E.2d at 622; *Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 230 (Ill. App. Ct. 2008) ("'[a]ny act or promise that benefits one party or disadvantages the other is sufficient consideration to support the formation of a contract.'" (quoting *Kalis v. Colgate–Palmolive Co.*, 787 N.E.2d 182, 183 (Ill. App. Ct. 2003))).

The Complaint's allegations regarding consideration are thin. Ultimately, though, Bayer alleges that in July 2017, Bayer and Aeropres entered into a contract

---

[7] To the extent Aeropres raises this same argument as to Counts II through V, the Court rejects it for these same reasons.

under which "Aeropres agreed to supply Bayer with Propellant A-31." [Dkt. 1, ¶ 56.]
It alleges that Bayer performed its obligations under the agreement by accepting the
Propellant A-31, and that Aeropres was "responsible for bearing the costs of product
technical and quality complaints, recalls and replacement," for the product it
supplied, which was triggered when Aeropres "provided Bayer with contaminated
Propellant A-31" that Bayer later recalled. [*Id.*, ¶¶ 57–59.] At the dismissal stage, the
Court must draw reasonable inferences in Bayer's favor; from these allegations, it is
reasonable to infer that Aeropres promised to sell Propellant A-31 and that Bayer
promised to pay for the amounts sold. That bargained-for exchange is enough at this
stage to establish that there was consideration, even absent an express reference to
purchase orders or supply agreements.

Lastly, Aeropres argues that the Complaint must be dismissed because it
contains no specific allegation that Aeropres supplied Bayer with product "that fell
short of the QAA's listed quality standards"; does not allege "a measurement
indicating how" any Propellant A-31 supplied to Bayer "could be considered
contaminated"; and does not identify any contractual term specifying "parameters for
benzene levels in Propellant A-31 [or] any term that required Aeropres to test" for
benzene. [Dkts. 15 at 11-12; 42 at 4–5.] But as already discussed, the Complaint
sufficiently alleges a breach of the contract. Bayer maintains that it performed all
conditions required by the QAA, and that Aeropres breached the agreement by
supplying contaminated Propellant A-31 and then by failing to reimburse Bayer for
recall-related losses. [Dkt. 1, ¶¶36–45, 60–61.] These allegations sufficiently state a

14

breach of contract claim, putting Aeropres on fair notice of its alleged breaches. *Peerless Network, Inc. v. MCI Commc'n Servs., Inc.*, 2015 WL 2455128, at *5–7 (N.D. Ill. May 21, 2015) (siding with those courts finding that a plaintiff is not required to cite specific contract provisions that have been breached but must at least place the defendant "on fair notice of the 'contractual duty' it breached"). Accordingly, the Court denies Aeropres's motion to dismiss Bayer's breach of contract claim under the direct theory of liability.

### 2. Breach of Contract - Third-Party Beneficiary (Count II)

Aeropres also seeks dismissal of the third-party beneficiary of contract claim, arguing that "there is no express provision in the Notice of Assignment identifying Bayer as a third-party beneficiary of the QAA." [Dkt. 15 at 12.]

In Illinois, if a contract "is entered into for the direct benefit of a third person who is not a party to the contract, that person may sue on the contract as a third-party beneficiary." *City Of Yorkville ex rel. Aurora Blacktop Inc. v. Am. S. Ins. Co.*, 654 F.3d 713, 716 (7th Cir. 2011) (citing *Carson Pirie Scott & Co. v. Parrett*, 178 N.E. 498, 501 (Ill. 1931). The test is "whether the benefit is direct, in which case the person may sue, or incidental, in which case the person may not." *Id.* The intent to benefit the third party "must affirmatively appear from the language of the contract. *Id.*; *Martis v. Grinnell Mut. Reinsurance Co.*, 905 N.E.2d 920, 924 (Ill. App. Ct. 2009) ("Whether someone is a third-party beneficiary depends on the intent of the contracting parties, as evidenced by the contract language."). Illinois courts "recognize a 'strong presumption against conferring contractual benefits on noncontracting third parties.'" *Sosa v. Onfido Inc.*, 8 F.4th 631, 639 (7th Cir. 2021)

(quoting *Marque Medicos Farnsworth, LLC v. Liberty Mut. Ins. Co.*, 117 N.E.3d 1155, 1159 (Ill. App. Ct. 2018)). To overcome that presumption, "the implication that the contract applies to third parties must be so strong as to be practically an express declaration." *Id.*

Aeropres maintains that dismissal of Count Two is warranted "because there is no express provision in the Notice of Assignment identifying Bayer as a third-party beneficiary of the QAA between Beiersdorf and Aeropres." [Dkt. 15 at 12.] Under Illinois law, a "contract does not have to specifically name the third-party beneficiary, as long as it defines a third-party by description of class, and the parties have identified the plaintiff at the time performance is due." *Zurich Cap. Markets Inc. v. Coglianese*, 2005 WL 1950653, at *8 (N.D. Ill. Aug. 12, 2005) (citing *Altevogt v. Brinkoetter*, 421 N.E.2d 182, 187 (Ill. 1981)). Thus, a provision in the Notice of Assignment explicitly designating Bayer as an intended third-party beneficiary is not a prerequisite for Count II to proceed.

Aeropres is correct, however, that the Notice of Assignment provides that "Bayer shall have no further rights under the Agreement." [Dkt. 15-2.] And it is true that had Bayer wished "to retain certain rights under the QAA, then it could have proposed a notice of assignment that included terms specifying which rights Bayer sought to retain." [Dkt. 42 at 6.] But the Complaint alleges enough facts that, taken as true, demonstrate it is entitled to relief. Bayer alleges that following assignment to Beiersdorf in August 2019, Aeropres had a contractual obligation to "supply Beiersdorf with Propellant A-31 to be used in the manufacture of Bayer's Lotrimin

16

and Tinactin products," and that "Bayer is a third-party beneficiary of the QAA because Aeropres entered into the agreement with Beiersdorf knowing and intending that the Propellant A-31 Aeropres supplied to Beiersdorf would be used in products manufactured for Bayer." [Dkt. 1, ¶¶31–34, 63–64.] Whether third-party beneficiary status actually existed is a factual question to be resolved after the parties have had the benefit of discovery. *ReceiverShip Mgmt., Inc. v. A.J. Corso & Assocs., Inc.*, 2021 WL 1222897, at *17 (N.D. Ill. Mar. 31, 2021) ("Because a determination of third-party beneficiary status must be based upon a consideration of the contract and *all the surrounding circumstances*, dismissal of [plaintiff's] third-party beneficiary claim at this early stage would be improvident") (quoting *See In re Chicago Flood Litigation*, 1993 WL 239041, at *9 (N.D. Ill. June 28, 1993) (emphasis in original)). Thus, the Court declines to dismiss Count II.

### 3. Warranty Claims (Counts III, IV, and V)

Bayer brings three warranty claims against Aeropres: breach of express warranties under 810 ILCS 5/2-313 (Count III); breach of implied warranty of merchantability under 810 ILCS 5/2-314 (Count IV); and breach of warranty of fitness for a particular product under 810 ILCS 5/2-315 (Count V). Aeropres argues that Bayer failed to plead privity for all three claims, and that the Complaint lacks the necessary factual allegations for the breach of implied warranty claims to survive dismissal. [Dkts. 15 at 21–26; 42 at 13–16.]

Under Illinois law, an express warranty can be created by a "description of the goods which is made part of the basis of the bargain." 810 ILCS 5/2-313(1)(b). "To state a claim for breach of express warranty, plaintiffs must allege that the seller: (1)

17

made an affirmation of fact or promise; (2) relating to the goods; (3) which was part of the basis for the bargain; and (4) guaranteed that the goods would conform to the affirmation or promise." *O'Connor v. Ford Motor Co.*, 477 F. Supp. 3d 705, 714 (N.D. Ill. 2020). A claim for breach of express warranty requires that the plaintiff be in privity of contract with the defendant. *Baldwin v. Star Sci., Inc.*, 78 F. Supp. 3d 724, 739 (N.D. Ill. 2015) (citation omitted). Generally, "a plaintiff must state the terms of the warranty alleged to be breached or attach it to the complaint." *Gubala v. CVS Pharmacy, Inc.*, 2015 WL 3777627, at *7 (N.D. Ill. June 16, 2015) (cleaned up).

Aeropres argues that because the Complaint does not allege that "unfit Propellant A-31 was sold by Aeropres to Bayer," Bayer does not have contractual privity to pursue its express warranties claim. [Dkts. 15 at 21; 42 at 13.] But the Complaint does allege this, specifically that Aeropres "suppl[ied] Propellant A-31 to Bayer (*both directly and indirectly*)," and that Aeropres "made express warranties upon which Bayer relied in purchasing and using Propellant A-31 from Aeropres." [Dkt. 1, ¶ 70.] This is sufficient at the dismissal stage to show that "the party suing has some contractual relationship with the one sued." *Crest Container Corp. v. R.H. Bishop* Co., 445 N.E.2d 19, 25 (Ill. App. Ct. 1982); *Caterpillar, Inc. v. Usinor Industeel*, 393 F. Supp. 2d 659, 677 (N.D. Ill. 2005). Thus, Bayer can proceed with its breach of express warranties claim for contaminated Propellant A-31 purchased before the assignment.

Regarding the Propellant A-31 supplied after the QAA was assigned to Beiersdorf, Bayer cites to the third-party beneficiary exception to privity, [Dkt. 32 at

14], which applies "where the manufacturer knew the identity, purpose and requirements of the dealer's customer and manufactured or delivered the goods specifically to meet those requirements." *Frank's Maint. & Eng'g, Inc. v. C.A. Roberts Co.*, 408 N.E.2d 403, 412 (Ill. App. Ct. 1980). Here, Bayer alleges that Aeropres "entered the assignment with Beiersdorf knowing and intending that the Propellant A-31 would be used in products Beiersdorf was manufacturing for Bayer." [Dkt. 1, ¶72.] This is sufficient given "the fact-intensive nature of the privity inquiry." *Elward v. Electrolux Home Prods., Inc.*, 214 F. Supp. 3d 701, 705 (N.D. Ill. 2016).[8]

"Implied warranty of merchantability and warranty for fitness for a particular purpose are two different claims, with their own elements and pleading requirements." *Sneed v. Ferrero U.S.A., Inc.*, 656 F. Supp. 3d 777, 785 (N.D. Ill. 2023) (citing 810 ILCS 5/2-314 and 5/2-315). To state a claim for breach of the implied warranty of merchantability, a plaintiff must allege (a) a sale of goods, (b) by a merchant of those goods, and (c) the goods were not of merchantable quality. *Brandt v. Boston Scientific Corp.*, 792 N.E.2d 296, 299 (Ill. 2003). To be merchantable, the goods must "pass without objection in the trade under the contract description" and must be "fit for the ordinary purposes for which such goods are used." *Id.* A plaintiff's "allegation that the goods were not merchantable at the time of sale should be supported by an allegation of what the ordinary purpose of the good is." *Solvay USA*

---

[8]     The breach of implied warranty of merchantability claim and the breach of implied warranty for a particular purpose claim also allege, sufficiently, that Aeropres had the requisite prior knowledge that Propellant A-31 would be used in Bayer's products. [Dkt. 1, ¶¶78, 84.]

*v. Cutting Edge Fabrication, Inc.*, 521 F. Supp. 3d 718, 726 (N.D. Ill. 2021) (citation omitted).

Aeropres argues that Bayer's implied warranty of merchantability claim should be dismissed because the Complaint does not allege facts sufficient to establish that Aeropres sold Propellant A-31 that was not merchantable at the time of sale, and because it fails to specify the ordinary uses for Propellant A-31. [Dkt. 15 at 22–23.] The Court does not agree. The Complaint alleges that Aeropres was "a merchant of Propellant A-31 and goods of that kind," and that it sold Propellant A-31 to Bayer and Beiersdorf for use in products Bayer manufactured. [Dkt. 1, ¶76.] It alleges the Propellant A-31 was not of merchantable quality because it "(a) would not pass without objection in the trade under the contract description; (b) was not of fair average quality within the contract description; (c) was not fit for the ordinary purposes for which Propellant A-31 is used; and (d) did not run, within the variations permitted by the QAA, of even kind, quality and quantity within each unit and among all units involved." [*Id.*, ¶77.] The Complaint also describes Aeropres's August 11, 2021 letter informing Bayer that "analysis revealed the isobutane contained detectable levels of benzene," and that Aeropres "regrets this development as it is not in keeping with Aeropres' standards of product manufacture." [*Id.*, ¶35; Dkt. 15-5.] Although Aeropres disputes the import of its admission in this letter, at the dismissal stage, the Complaint sufficiently alleges a sale of goods by a merchant that were not of merchantable quality. *Brandt*, 792 N.E.2d at 299.

20

Lastly, Aeropres argues that Bayer's implied warranty of fitness for a particular purpose claim should be dismissed because Bayer failed to "identify the non-ordinary purpose for which the plaintiff used the product in question"; and lacks "factual allegations that Bayer relied on Aeropres'[s] skill and expertise in deciding which type of propellant ingredient should be used to create Lotrimin and Tinactin." [Dkt. 15 at 23–26.] "To state a claim for breach of the implied warranty of fitness for a particular purpose, a plaintiff must allege that '(1) the seller had reason to know of the particular purpose for which the buyer required the goods; (2) the buyer relied on the seller's skill and judgment to select suitable goods; and (3) the seller knew of the buyer's reliance on its skill and judgment.'" *Halo Branded Sols., Inc. v. RTB W., Inc.*, 2016 WL 1161340, at *5 (N.D. Ill. Mar. 24, 2016) (citing *In re McDonald's French Fries Litig.*, 503 F. Supp. 2d 953, 957 (N.D. Ill. 2007)). "'No warranty for a particular purpose is created if the intended use is no different from the ordinary use of the product.'" *CHS Acquisition Corp. v. Watson Coatings, Inc.*, 2018 WL 3970137, at *6 (N.D. Ill. Aug. 20, 2018) (citing *Rosenstern v. Allergan*, 987 F. Supp. 2d 795, 804 (N.D. Ill. 2013)).

The Complaint alleges that, at the time of contracting, Aeropres "had reason to know that Propellant A-31 would be used" in Lotrimin and Tinactin products, "which were intended for sale and use in topical applications in humans," and that the Propellant A-31 Aeropres sold to Beiersdorf "was not fit for the purpose of being incorporated into products intended for human topical application." [Dkt. 1, ¶¶81–82.] Bayer also alleges that it relied on Aeropres's "skill and judgment to select

suitable goods for the purpose of being incorporated into products intended for human topical application." [*Id.*, ¶ 83.] These allegations suffice to state a claim. Aeropres's motion to dismiss Bayer's express and implied warranty claims is denied.

### 4. Negligence and Strict Liability (Counts VI and VII)

Bayer's remaining claims are for negligence (Count VI) and strict liability (Count VII), which Aeropres argues should be dismissed because any recovery is barred by the Illinois Supreme Court's decision in *Moorman Manufacturing Company v. National Tank Company*, 435 N.E.2d 443 (Ill. 1982). Because the economic loss rule prohibits a plaintiff from bringing negligence or strict liability claims for purely economic losses, the Court grants Aeropres's motion to dismiss these claims.

Illinois adheres to the economic loss doctrine, which bars recovery for a strict liability or negligence claim based on a plaintiff's monetary loss incurred without a corresponding claim of injury to the plaintiff's person or property. *In re Chicago Flood Litig.*, 680 N.E.2d at 274–75 (citing *Moorman Mfg. Co.*, 435 N.E.2d 443, 450–52). In *Moorman*, the Illinois Supreme Court explained that "where only the defective product is damaged, economic losses caused by qualitative defects falling under the ambit of a purchaser's disappointed expectations cannot be recovered under a strict liability theory . . . .[The Illinois Supreme Court's] conclusion that qualitative defects are best handled by contract, rather than tort, law applies whether the tort theory involved is strict liability or negligence." 435 N.E.2d at 451. The *Moorman* rule is intended to limit the remedies available in tort law when the dispute is one that should be governed by contract law. *See In re Illinois Bell Switching Station Litig.*, 641 N.E.2d 440, 444 (Ill. 1994). "Economic loss has been defined as damages for

inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property. . . . " *Moorman*, 435 N.E.2d at 449.

There are three exceptions to the economic loss doctrine: (1) where the plaintiff sustained personal injury or property damage from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions. *In re Chicago Flood*, 680 N.E.2d at 272 (citing *Moorman*, 435 N.E.2d at 450–52); *see also Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 693 (7th Cir. 2011). "These exceptions have in common the existence of an extra-contractual duty between the parties, giving rise to a cause of action in tort separate from one based on the contract itself." *Catalan*, 629 F.3d at 693.

Bayer contends that the sudden, calamitous, or dangerous occurrence exception applies here because testing shows that the "benzene contamination had been occurring since at least 2018," "but the manifestation of the contamination was sudden and calamitous once revealed in August 2021, resulting in the recall and destruction of Bayer's products." [Dkt. 32 at 24.] According to Bayer, because it "did not bargain for or receive Lotrimin and Tinactin from Aeropres," "those finished products constitute 'other property' under *Moorman*." [*Id.* at 24–25.]

23

"Property damage for purposes of the 'sudden or dangerous occurrence' exception must be extrinsic to the defective product itself." *TreeHouse Foods, Inc. v. SunOpta Grains & Foods Inc.*, 2019 WL 1429337, at *8 (N.D. Ill. Mar. 29, 2019) (citing *Moorman*, 435 N.E.2d at 450; *see Trans States Airlines v. Pratt & Whitney Canada, Inc.*, 682 N.E.2d 45, 49–55 (Ill. 1997). In determining whether "other property," as opposed to the product itself, was damaged, Illinois courts apply a "bargained-for" approach. *Westfield Ins. Co. v. Birkey's Farm Store, Inc.*, 924 N.E.2d 1231, 1243 (Ill. App. Ct. 2010). "The relevant inquiry is, What is the object of the contract or bargain that governs the rights of the parties?" *Trans States Airlines*, 682 N.E.2d at 58. A product and one of its component parts "may constitute two separate products," but "if the parties bargained for a fully integrated product, the product and the component part constitute one product and the economic loss doctrine bars any recovery in tort for the damage to that product." *Westfield Ins. Co.*, 924 N.E.2d at 1243 (citing *Trans States Airlines*, 682 N.E.2d at 58-59.)

Although Bayer argues it suffered damage to "other property" because Propellant A-31 is a separate component of Lotrimin and Tinactin, the gravamen of its allegations are that Propellant A-31 is an important ingredient used to *create* Lotrimin and Tinactin products. [Dkt. 1, ¶¶25–26.] In this way, the damaged property cannot be separated from the product itself, and there is no allegation that contaminated Propellant A-31 caused damage to anything beyond the final product itself. *Nationwide Agribusiness Ins. Co. v. USG Corp.*, --- F.Supp.3d ----, 2024 WL 342592, at *6 (N.D. Ill. Jan. 30, 2024) ("the only damages [plaintiff] identifies are the

24

loss of Royal Canin's finished pet food product and other constituent ingredients that were blended with the calcium sulphate in order to make this final product"; because those losses are "reasonably foreseeable as a direct consequence of the failure of the defective product" they "fall within the scope of risk allocated by the original bargains" between the parties); *TreeHouse Foods*, 2019 WL 1429337, at *9 ("The damage to finished products, equipment, and raw materials . . . arose from 'disappointed expectations' of a commercial bargain and cannot be recovered in tort"); *Medefil, Inc. v. Sci. Protein Lab'ys, LLC*, 2015 WL 3962820, at *4 (N.D. Ill. June 26, 2015) ("The logical result of any defect in the [pharmaceutical ingredient] provided by SPL to Medefil would be the failure of the Heparin Lock Syringes as a whole."). In sum, Bayer's alleged damages fall squarely within the categories of economic losses properly covered by contract remedies rather than tort remedies. Because the negligence and strict liability claims are barred by the economic loss doctrine, these claims are dismissed with prejudice.

## IV. Conclusion

For the reasons stated above, Aeropres's motion to dismiss [Dkt. 13] is granted in part and denied in part. Bayer's negligence claim (Count VI) and strict liability claim (Count VII) are dismissed with prejudice; the motion to dismiss is otherwise denied.

Enter: 23-cv-4391
Date: March 28, 2024

_____
Lindsay C. Jenkins
United States District Judge